# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| STEVEN JURCZAK,<br><br>    Plaintiff,<br><br>v.<br><br>MELISSA GIBBS,<br><br>    Defendant. | Case No.<br><br>**COMPLAINT FOR DEFAMATION**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW Plaintiff Steven Jurczak ("Jurczak"), and states his

Complaint for Defamation against Defendant Melissa Gibbs ("Gibbs"), as follows:

## INTRODUCTION

1. This a defamation action against Defendant Gibbs for her malicious and knowingly false and *per se* slanderous accusations, *inter alia*, that Mr. Jurczak raped her, drugged her, committed perjury, and posed a physical threat in their workplace.

2. In reality, Mr. Jurczak and Defendant Gibbs had a consensual sexual relationship that resulted in the conception of their daughter ("Daughter"), who was born on December 1, 2020. Mr. Jurczak and Defendant Gibbs had previously been romantic partners for years, even living together. They rekindled their

romantic relationship about 7-months after they broke up, leading to a two-week affair and the conception of their Daughter.

3.     But Defendant Gibbs decided to end the affair, return to the boyfriend she had cheated on, tell him that the baby was his, and then marry him.

4.     Mr. Jurczak and others suspected he was the father of his Daughter, so when he learned from a third party that Gibbs was pregnant, he asked to speak with her before their Daughter was born, which she refused. And then several weeks after their Daughter's birth, he asked Defendant Gibbs to submit her to a paternity test. She again refused.

5.     On January 11, 2021, Mr. Jurczak was forced to file a petition for paternity testing ("Paternity Action"), with the goal of being legitimated as the father of his Daughter so they can have a relationship.

6.     Defendant Gibbs responded with a campaign of lies. For months during the Paternity Action, Defendant Gibbs knowingly misrepresented to the court that Mr. Jurczak was not the biological father—despite having secretly ruled out the only other possible father (her current husband) with a paternity test only days after she was served with the Paternity Action in January.

7.     On May 5, 2021, Defendant Gibbs was finally ordered to submit to a paternity test for Mr. Jurczak—which she knew would reveal that Mr. Jurczak is

the father, and which would go a long way toward achieving his legitimation. When her efforts to resist a paternity test failed, and obviously intent on preventing Mr. Jurczak from being involved in his Daughter's life, Defendant Gibbs hatched a new plan.

8.      Georgia's legitimation statute "create[s] a presumption against legitimation" "[i]f the court determines by clear and convincing evidence that the father caused his child to be conceived *as a result of having nonconsensual sexual intercourse* with the mother of his child."  O.C.G.A. § 19-7-22(d)(2) (emphasis added).

9.      On May 9, 2021, just four days after the paternity test order, Defendant Gibbs knowingly fabricated a rape accusation against Mr. Jurczak in a desperate attempt to win the Paternity Action and destroy Mr. Jurczak personally and professionally.  She contacted the Atlanta Police Department ("APD") and falsely claimed that Mr. Jurczak had raped her when their Daughter was conceived. She was then referred to the APD's Special Victim's Unit ("SVU").

10.     The penalty for rape in Georgia ranges from death, to imprisonment for life without parole, to imprisonment for not less 25 years.  Defendant Gibbs was willing to put Mr. Jurczak's life and freedom on the line based on false accusations, *inter alia*, to gain an advantage in the Paternity Action.

11.     The next day, May 10, 2021, Defendant Gibbs went to the SVU and again accused Mr. Jurczak of rape on a single occasion: March 14, 2020, when she claims their Daughter was conceived. She admitted to the SVU that she was there because she did not want the paternity test to happen.   Fortunately, that conversation was videotaped, and it was riddled with lies and material omissions. Two SVU officers heard her out, and wisely saw through her false rape accusations.

12.     After Defendant Gibbs failed to get the SVU to stop the paternity test by arresting Mr. Jurczak, she brought her false accusation of rape to the Paternity Action, but she decided to add more. On May 20, 2021, Defendant Gibbs filed frivolous counterclaims in the Paternity Action for rape. But the accusation ballooned into four rapes over a five-day period in March of 2020.  She has since voluntarily dismissed the rape counterclaims and admitted that 3 of the 4 alleged rapes never happened.

13.     As the months wore on, Defendant Gibbs went after Mr. Jurczak's job—using her co-worker as a cat's-paw to get Mr. Jurczak removed from their mutual job site.

14.     Since then, the man who Defendant Gibbs married under the false pretense that he is the father has voluntarily surrendered his parental rights as to Mr. Jurczak's Daughter.

15.     Mr. Jurczak, on the other hand, continues to fight to be the father of his Daughter, who no longer legally has a father. And for that, Defendant Gibbs has falsely branded him a rapist.

16.     Mr. Jurczak has yet to meet his 17-month-old Daughter.

17.     To this day, despite Defendant Gibbs dismissing her false counterclaims, she has maintained her false accusations of rape in the Paternity Action and thus failed to admit the truth. When given the opportunity to retract the accusations to the APD and SVU, she refused. She has now forced Mr. Jurczak to bring this claim to affirmatively prove he is not a rapist and to defend his good name, both with his Daughter and all those who have learned of Defendant Gibbs' public, false accusations.

## **PARTIES**

18.     Mr. Jurczak is an individual resident of the State of New Jersey.

19.     Defendant Gibbs is an individual resident of the State of Georgia and this District who can be served at her residence in this District.

## JURISDICTION AND VENUE

20.     There exists complete diversity of citizenship between Mr. Jurczak on the one hand and Defendant on the other hand.

21.     The amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

22.     Therefore, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).

23.     Venue is proper in the United States District Court for the Northern District of Georgia, Atlanta Division, pursuant to 28 U.S.C. §§ 1391(b)-(c) because Defendant resides in this judicial district.

24.     This Court has personal jurisdiction over Defendant because she resides in this judicial district.

## FACTUAL ALLEGATIONS

25.     Mr. Jurczak is a student who is obtaining a degree to be a physician's assitant.

26.     Defendant Gibbs is a liver transplant surgeon at Piedmont Hospital in Atlanta, Georgia.

27.     Mr. Jurczak and Defendant Gibbs dated each other on-and-off between September 2017 and July 2019, which included living together at times.

28.     When they first met, Defendant Gibbs was working at Piedmont Hospital, and Mr. Jurczak was a surgical coordinator who assisted surgeons, including Defendant Gibbs, with the recovery of organs for transplant.

29.     While they were dating, Mr. Jurczak got a well-paid job with Organ Preservation Consultants as an organ perfusionist. His job was to help keep organs viable until they could be transplanted into patients on the transplant waiting list.

30.     Despite Mr. Jurczak breaking up with Defendant Gibbs, they remained friendly and exchanged thousands of text messages over seven months until they rekindled their romance in February of 2020.

31.     Mr. Jurczak and Defendant Gibbs spent the afternoon together on February 29, 2020, and he then spent the night at her home, where they both admit that they had consensual, unprotected sexual intercourse.

32.     At that time, Defendants Gibbs had a boyfriend, but she then broke up with him, purportedly because of her sexual encounter with Mr. Jurczak.

33.     This sparked a two-week consensual sexual relationship between Mr. Jurczak and Defendant Gibbs during which they spent the night together three times having consensual, unprotected sexual intercourse on the following dates: (1) February 29th to March 1st; (2) March 10th to the 11th, and (3) March 14th to the

15th.  The parties also had a brief consensual sexual encounter on March 6, 2020, while Defendant Gibbs' children went to dinner with her ex-husband.

34.     Mr. Jurczak and Defendant Gibbs also spent time together on March 4, 2020, when he accompanied her and one of her daughters to the other daughter's school concert.

35.     At some point during this two-week consensual sexual affair, Mr. Jurczak and Defendant Gibbs conceived their Daughter, who is now a 17-month-old toddler.

36.     When the parties were together during this period, they sometimes drank moderate amounts. For example, on March 14, 2020—which is the day that Defendant falsely reported that Mr. Jurczak had raped her—over a period of at least four hours, Defendant Gibbs drank two alcoholic ciders before Mr. Jurczak came to her home, then after Mr. Jurczak arrived, she drank a glass of wine, followed by drinking some portion of another glass of wine that Mr. Jurczak had poured for her.

37.     Between the period of February 29, 2020, through March 19, 2020, Mr. Jurczak and Defendant Gibbs exchanged more than one thousand text messages with each other—none of which even hinted at any aspect of their sexual

relationship being non-consensual. The same can be said for every text message that Defendant Gibbs has ever sent Mr. Jurczak.

38.    The parties' text messages during their two-week consensual sexual relationship demonstrated mutual affection and intermittent "sexting."

39.    For example, on March 6, 2020, when the parties had consensual sex at Defendant Gibbs' home while her two daughters were out to dinner, they had the following exchange in which she pleaded for Mr. Jurczak to get to her house, and then chided herself for being a bad person for having sex with him:



40.    For example, on March 10, 2020, while Defendant Gibbs waited for Mr. Jurczak at his sister's home where they would spend the night together, she texted him a picture of herself lying in a bed wearing pajamas. And then the next morning they joked about Mr. Jurczak getting in his workout with her, which was a clear reference to them having consensual sexual intercourse:



41.    Since the birth of their Daughter, Defendant Gibbs has repeatedly falsely denied that she and Mr. Jurczak had sexual intercourse on March 10, 2020—including in her false statements to the SVU, when she chose not to show the above text messages to the officers.

42.    On March 14, 2020, just before Mr. Jurczak went to Defendant Gibbs' house and they had consensual, unprotected sexual intercourse, the parties had the following sexually charged text exchange, with Defendant Gibbs prodding Mr. Jurczak to continue:

Message sent 3/14/2020 2:22:32 PM

I have no life and Mars has sweet potatoes now, so I am set...thank you for saying that. Working next to you and watching you in action is so fucking sexy...I wish I could just show you right there



Message received from Melissa Gibbs 3/14/2020 2:25:08 PM

Oh yeah?

Message sent 3/14/2020 2:31:25 PM

BAD MJ



Message received from Melissa Gibbs 3/14/2020 2:31:49 PM

What????

Message sent 3/14/2020 2:32:13 PM

Yes MJ...you want me to be more descriptive?

Message sent 3/14/2020 2:32:20 PM

Its bad

Message received from Melissa Gibbs 3/14/2020 2:32:20 PM



Message sent 3/14/2020 2:32:28 PM

I love it

Message received from Melissa Gibbs 3/14/2020 2:32:31 PM

What's bad

Message sent 3/14/2020 2:32:57 PM

My desire to take you in the parking deck after we scrub out

Message sent 3/14/2020 2:34:44 PM

Too much?

Message received from Melissa Gibbs 3/14/2020 2:35:14 PM

Take me to to parking deck?

Message received from Melissa Gibbs 3/14/2020 2:36:22 PM

Then what?

Message sent 3/14/2020 2:36:40 PM

Hmmm...I like where this is going.

Message sent 3/14/2020 2:37:12 PM

I would start making out with you and then kiss your neck while biting it gently

Message received from Melissa Gibbs 3/14/2020 2:37:28 PM



Yummy

Message sent 3/14/2020 2:38:43 PM

Then I would lick and suck on your clit until you told me to put this long, rock hard dick inside of you

Message sent 3/14/2020 2:40:05 PM

Then I would set the alarm and fuck you hard until I can make the alarm sound

Message sent 3/14/2020 2:40:17 PM

By rocking the truck back and forth!!!

Message received from Melissa Gibbs 3/14/2020 2:43:39 PM



Hahaa we would set off all the car alarms

Message sent 3/14/2020 2:44:08 PM

Hmmmmm...yes. sorry was that too much?

Message sent 3/14/2020 2:44:16 PM

If I crossed the line I'm sorry

Message received from Melissa Gibbs 3/14/2020 2:45:06 PM



No you're not LOL

Message sent 3/14/2020 2:46:13 PM

Ok...I am still treading lightly but these past two days you have been sexier to me than ever...did not even know that was possible but you did it MJ

13

43.     The above exchange occurred less than a handful of hours before Defendant Gibbs has alleged that she rebuffed Mr. Jurczak's attempts to kiss her and further has alleged that he raped her while she was unconscious. Notably, she falsely told the SVU that at the time the above exchange occurred, she and Mr. Jurczak were merely friends, and she was not interested in sexual activity with him.

44.     Within two hours of the above exchange, Mr. Jurczak went to Defendant Gibbs' home where he spent the night and the parties had consensual, unprotected sexual intercourse.

45.     On March 16, 2020, Defendant Gibbs got back together with her boyfriend/now-husband and had unprotected sexual intercourse, bringing an end to her rekindled romance with Mr. Jurczak.

46.     Between the morning of March 15, 2020, through March 28, 2020, the parties exchanged more than 135 text messages with no hint of any accusation that Mr. Jurczak had raped Defendant Gibbs or had acted inappropriately with her in any way.

47.     On April 1, 2020, Defendant Gibbs claims she took a home pregnancy test that showed that she was pregnant.

48.     Sometime thereafter, she misled her boyfriend/now-husband into believing that the baby was his, and by the end of May of 2020, they were married.

49.     By early September 2020, Mr. Jurczak had been told that Defendant Gibbs had eloped and was pregnant with a due date in December.  He therefore knew that the baby could be his because the date of conception had to be in approximately March 2020 when the parties were spending time together.

50.     Mr. Jurczak then repeatedly attempted to discuss the matter with Defendant Gibbs, but she refused.

51.     Mr. Jurczak's Daughter was born on December 1, 2020.

52.     On December 28, 2020, Mr. Jurczak sent Defendant Gibbs an email congratulating her and asking her to submit to paternity testing—as Mr. Jurczak cannot live with the notion of having no relationship with his Daughter.

53.     Defendant Gibbs refused to submit to paternity testing.

54.     On January 11, 2021, when his Daughter was less than 6-weeks-old, Mr. Jurczak filed the Paternity Action in Fulton County Superior Court, requesting that the parties submit to paternity testing.

55.     Shortly thereafter, Defendant Gibbs had her husband take a paternity test, and when the results came back in late January 2021, they showed that her husband was not the father.

56.     By this point in late January 2021, by Defendant Gibbs' own admission, she knew: (1) that Mr. Jurczak—the only other person with whom she had sexual contact in March 2020—was the father of their Daughter; and (2) that she had sexual intercourse with Mr. Jurczak during her window of fertility in early March 2020.

57.     Despite her knowledge that Mr. Jurczak was the father, Defendant Gibbs, through her counsel, affirmatively and repeatedly lied to the court in the Paternity Action, denying the fact that Mr. Jurczak was their Daughter's biological father.

58.     Defendant Gibbs carried on this lie in hopes of getting the Paternity Action dismissed before Mr. Jurczak could obtain a paternity test.

59.     In a hearing on May 3, 2021, for Defendant Gibbs' motion to dismiss the Paternity Action, Defendant Gibbs' counsel, Ms. Rhodes, stated the following:

> MS. RHODES:  Essentially.  So she and Mr. Jurczak had a relationship that ended in about 2019.  And during the period of time that Mr. Jurczak has alleged that there was requisite sexual contact.  She did not have consensual intercourse -- or does not know of any sexual intercourse with Mr. Jurczak.

. . .

```
     THE COURT:  So how old is this child?  So there was a
relationship in 2019 that ended at some point.  And so doing
the math, there's no way that he could have been the father
is what you're saying?
     MS. RHODES:  That's exactly right.  And I have today
```

60.    Two days later, on May 5, 2021, the court held an additional hearing on the motion to dismiss the Paternity Action. This evidentiary hearing was for the court to ascertain whether there was any evidence of sexual contact during the period of possible conception such that it would be appropriate to order a paternity test.

61.    Defendant Gibbs perjured herself in that hearing, concealing the fact that a paternity test had been performed and testifying under oath that she did not have sexual intercourse with Mr. Jurczak at any point in March when they could have conceived their Daughter—*despite her knowledge from the secret paternity test that she and Mr. Jurczak did in fact conceive a child at that time*.

62.    Regarding March 10, 2020—the day that Defendant Gibbs apologized for making Mr. Jurczak miss his workout, and he responded that he got his workout with her—Defendant Gibbs testified as follows:

Q.  Okay.  And tell me about this evening on March 10th at his sister's home.  Did you have -- to just begin with, did you have sex with Mr. Jurczak on March 10th at his sister's house?

A.  No.

63.     Regarding March 11, 2020, Defendant Gibbs testified as follows:

Q.  Okay.  And did you have sex with Mr. Jurczak that morning as he has alleged?

A.  No.  That's not really my thing.

Q.  Okay.  And then you did not see Mr. Jurczak again until the 14th; is that right?

A.  Yes.

64.     Regarding March 14, 2020—which is the date that four days after the hearing she alleged Mr. Jurczak raped her—Defendant Gibbs testified as follows:

Q.  Okay.  And did you have sex with him on the 14th when he came to your house?

A.  No.

65.     Regarding March 15, 2020, Defendant Gibbs testified as follows:

> Q. Okay.  And did you have sex with him the following
> morning on the 15th?
>
> A. No.  This is a new date.  I looked last night at my
> Fitbit and I slept until after 7 a.m. and then I had to be at the

66.   By the time Defendant Gibbs provided the above testimony, the parties had been litigating the Paternity Action for nearly 4 months, and *Defendant Gibbs* had never suggested that Mr. Jurczak had raped her.  To the contrary, she denied any sexual contact—consensual or otherwise—on the relevant dates.

67.   During the May 5, 2021, hearing, the court ruled from the bench, denying Defendant Gibbs' motions to dismiss and to strike. The court then ordered paternity testing. At that point Defendant Gibbs knew the testing would reveal that Mr. Jurczak is the father, because she had already ruled out her then-husband, who she knew was the only other person with whom she had sexual intercourse in March 2020.

68.   Once the paternity test demonstrated that Mr. Jurczak was the father, he would have surmounted a fundamental hurdle to having the child legitimated and forming a relationship with his Daughter.

69.   Georgia's legitimation statute, however, "create[s] a presumption against legitimation" "[i]f the court determines by clear and convincing evidence

that the father caused his child to be conceived *as a result of having nonconsensual sexual intercourse* with the mother of his child." O.C.G.A. § 19-7-22(d)(2) (emphasis added).

70.    At that point, Defendant Gibbs set into motion her plan to accuse Mr. Jurczak of raping her.

71.    On May 9, 2021—only four days after the hearing, but more than four months from when Mr. Jurczak asked for a paternity test—Defendant Gibbs made multiple false and *per se* slanderous oral statements to the APD accusing Mr. Jurczak of raping her and drugging her on March 14, 2020, which is the day Defendant Gibbs contends their Daughter was conceived (the "May 9 APD Accusations").

72.    When she made the May 9 APD Accusations, Defendant Gibbs intended to and did communicate that Mr. Jurczak drugged and raped her on March 14, 2020.

73.    Upon information and belief (because her statement was not recorded), while making her May 9 APD Accusations, Defendant Gibbs made the following additional statements, which are either independently false and *per se* slanderous, or contributed to the false and *per se* slanderous gist that Mr. Jurczak had drugged and raped Defendant Gibbs:

a.      She falsely stated to the APD that she did not know whether Mr. Jurczak was the father of their Daughter;

b.      She falsely stated that she did not have any sexual contact with Mr. Jurczak in a time frame that could have resulted in the conception of their Daughter;

c.      She falsely stated that she did not recall having sexual intercourse with Mr. Jurczak in a time frame that could have resulted in the conception of their Daughter;

d.      She falsely stated that she was unconscious when they had sexual intercourse on March 14, 2020;

e.      She falsely stated that Mr. Jurczak had caused her to be unconscious when they had sexual intercourse on March 14, 2020, including by possibly drugging her;

f.      She falsely stated that in 2020, she and Mr. Jurczak only had sexual intercourse on February 29th;

g.      She falsely stated that the reason she was accusing Mr. Jurczak of rape was because he provided a sworn affidavit stating he had sexual intercourse with her on March 14, 2020, and that it could not have been consensual because she did not recall it;

   h.  She falsely stated that for the date of March 14, 2020, her Fitbit

showed that for a three-hour period starting at 6:38 pm, she was

unconscious, despite the data showing she was awake by 8:46 pm, and

remained awake until 11:59 pm; and

   i.  She correctly stated that Mr. Jurczak did not rape her on

February 29, 2020, or March 1, 6, 10, 11, 15, 2020.

74.  On May 10, 2021—only five days after the court ordered paternity

testing—Defendant Gibbs provided an oral statement to the SVU making false and

*per se* slanderous accusations that: Mr. Jurczak raped her on March 14, 2020; Mr.

Jurczak drugged her or got her intoxicated against her will to the point of losing

consciousness on March 14, 2020; and Mr. Jurczak committed perjury (the "May

10 SVU Accusations").

75.  When she made the May 10 SVU Accusations, Defendant Gibbs

intended to and did communicate that: Mr. Jurczak raped her on March 14, 2020;

Mr. Jurczak drugged her or got her intoxicated against her will to the point of

losing consciousness on March 14, 2020; and Mr. Jurczak committed perjury.

76.  While making her May 10 SVU Accusations, Defendant Gibbs made

the following statements, which are either independently false and *per se*

slanderous, or contributed to the false and *per se* slanderous gists that Mr. Jurczak

had drugged Defendant Gibbs and/or got her intoxicated against her will to the point of losing consciousness and then raped her:

    a.     "And a person I was in contact with over a year ago, um, basically, was filing for paternity testing of this child. And, this was a few months ago, it, I, that I didn't have any sexual contact with this person, in any—we used to have a relationship—in any timeframe that could have produced this baby that I was dating, in, with my boyfriend who we got married when I found out I was pregnant. And so I fought that paternity test with an attorney, uh, to this petition in civil court, and basically saying this can't be this person's child."

    b.     "So then on Wednesday, that just passed we had a hearing before judge where he basically swore that we had sex together on a date where I know I was with him and we were hanging out. Because I had broken up from my boyfriend that I'm now with and married to. And we were um having drinks and stuff, and he acknowledges and sort of reported the same thing during this hearing. And then I know that we just uh were watching TV and had drinks and stuff. And I know that I went to sleep. Well, I guess I passed out because I don't remember anything. And uh I actually the other day looked back on my Fitbit, because I wear it all the

time. And I was asleep in the evening before bedtime then I was asleep at nighttime. And uh there was details given in this hearing on Wednesday and basically saying that we had sex. And as far as my knowledge, we didn't have sex."

      c.    "So, uh, it's, I understand it's strange because it's so far after the fact, but I didn't know that that's what happened. And he just testified in court on Wednesday saying that he came over and we had sex, and we didn't. I told him we didn't, and that's what I testified. And now they're asking for paternity test. So basically, this, I thought I was refusing the testing [inaudible] because he filed papers to do it because I thought there's no way this person could be the father of this child. And, he, I had a past relationship with him and we were friends and obviously that was a mistake. And once I got back with my boyfriend and, um, we got married and stuff, and he's always told me, 'This guy is bad news, you just have him out of your life.' And so I just basically the day after this happened, I didn't feel good about it. I mean, he tried kissing me, and I, I shook my head no and backed from him. And he said, 'You need more drink.' And we were watching Netflix or something and he left the room to get a drink. So I don't know if there was something in it or what but all I know is I just went... I fell

asleep. Or I guess it wasn't just sleep but I was unconscious and so, um, I didn't think that there was any chances of this is why I just said to refuse the paternity testing. Why would this guy be coming back a year later trying to get accepted? I know he's probably just trying to do anything to get involved back in my life because, he, I had to block him, like on my phone and on social media and everything after I got back with my now husband. Um, because he'd already jeopardized my relationship before. So, um, now that I... I'm thinking back to this event that he's describing, that he described in front of this, uh, the judge in hearing on Wednesday, basically that if this testing gets done it's... I don't know. It's not . . . . I didn't participate in that willingly. So, I feel like it's important for me to tell you guys because I, I can't... we'll really, I don't even want to know."

d.      "Uh, a rape charge." [Responding to, "Okay. So what exactly are you here to report on? What are you filing?"]

e.      "Which I just thought it was ludicrous because, I, it couldn't have been possible [that Mr. Jurczak was the biological father]."

f.      "I, no, because I can't remember [how I was raped]. It's just that he's telling me that is what happened and it . . . ."

g.      "The last time [Mr. Jurczak and I had sex] was February 29th."

25

h.     " . . . I was saying we didn't [have sexual contact] like during this fertility period . . . ."

i.     "This isn't, this can't be. It's not possible [that Mr. Jurczak was the biological father]. I mean, I know when my cycle is, and I know that that's not possible. So I just wanted to, you know, deny it."

j.     "Right [I don't remember anything sexual happening on March 14, 2020]. I don't remember anything like that. We were just sitting there and watching TV. And then I... That's why I came in telling you [unintelligible] where or how anything happened because . . . ."

k.     "So what about the fact that I was unconscious? Why I don't remember [having sex on March 14, 2020]?"

l.     "Right." [Responding to, "And so he explained that you guys had sex. You saying that you don't even remember any of that."]

m.     "[The Paternity Action is] the only reason I'm aware of that [having sex on March 14, 2020]."

n.     "He never told me we had sex that day before. And so I didn't know that it happened. I only know because— So he, he came up with the paternity testing. He sent the petition back in January. But I said, this is not possible. . . . So it's because he said on this date that we did that that's why."

26

o.    "Correct." [Responding to, "And that's what I'm saying. You've had consensual sex with him multiple times and then this specific day is the date that you didn't remember until, we, you guys went to court. Correct?"]

p.    "I was passed out. So he had sex with me while I was unconscious."

q.    "That's what I had thought had happened until he testified in court on Wednesday that he had sex with me then." [Responding to, "But you articulated that you remember that he kissed you, and you felt uncomfortable, and you went to sleep. That was that."]

r.    "Because my Fitbit says I was asleep, and I remember being asleep." [Responding to, "Okay. So where are we getting that you were unconscious?"]

s.    "I don't remember anything, so I assumed I fell asleep. And then I only checked my Fitbit after all this. I didn't check it a year ago but, I, it still records the logs for, I guess over a year. And it shows that in that evening, after he came over, that I was asleep for like three hours. And then I woke up and then went to bed for the night for another six or seven hours. So, I mean I was... I don't just fall asleep in the middle of the day like that.

So, I mean, he's saying that he had sex with me at a time where we were hanging out. And I can't remember what happened because there was alcohol and whatever else involved to where I lost consciousness. And I just thought I slept. But because he testified on Wednesday that he had sex with me, how could that be if I didn't agree to it? I mean, what's the definition of rape? He had sex with me, and I didn't agree to it."

    t.    "What I'm telling you is I was unable to give consent. And he had sex with me in a state where I was intoxicated or drugged or something, but I was unable to consent. And I didn't consent."

    u.    "And he said that we did." [Responding to, "And the only reason you know now that you had sex with him is because he wants a paternity test."]

    v.    "Correct." [Responding to, "And it's possible is the baby is not your husband's. It's possibly his child?"]

    w.    "I did not want to have sex with him. I did not want to have unprotected sex with him. I did not want to get pregnant by him. I, I didn't agree to any of that. Just, I mean, has anyone ever had unconsensual [sic] sex with somebody that they used to be a boyfriend? I mean it's just because it used to be a boyfriend doesn't mean that I agree."

x.   "And what if they were drugged?"

y.   "I was not able, of sound mind to consent to him when he was giving me more drinks. And it's not okay to have sex with someone just because you get them drunk. . . . That's why I'm reporting to you."

z.   "I was unconscious when it happened. I could make something up for you but I'm telling you the truth. I was unconscious."

aa.   "I didn't do anything wrong here. There was a date in question where I was hanging out with somebody who I used to date previously, was friends with only. And we were drinking, he was trying to kiss me, and I said, 'No.' And so he said, 'I need more drink.' And we're sitting watching TV and drinking, and I don't remember anymore after that. . . . And this person I was hanging out with is asking for paternity testing for the child. And I told the civil court in the matter that it wasn't possible for him to have conceived a child with me because we didn't have any sex during that time after my period. We just had a court hearing on Wednesday, and he made affidavits insisting that we had sex on this date. And, it's, I was not aware to consent to any sex. And I wasn't aware that that was happening. And he's saying he did it. It did. . . . I'm just telling you how I became aware of it because he's swearing to the court and putting an affidavit that we had had

sex at my, at the house on this date. And I'm saying that if that happened, it's not with my knowledge or agreement. And that's to my understanding that that's not allowed for people to have sex with you when you're not able to consent or you're unconscious."

bb.    "But it doesn't mean that I was in agreement with sleeping with him anymore after that because I wasn't."

cc.    "And so then after that I was upset and we hung out a couple of times, but there wasn't any consexual [sic] sex happening in that time. It was very clear that we were just friends."

dd.    "He made advances which I refused. And then he said, 'No?' And he said, 'Oh, you need more to drink.' And so, but, I mean, we were just hanging out there. And I, I shouldn't say I fell asleep. I passed out. I blacked out. Whatever you want to call it."

ee.    "Okay. My perception at the time was that I just... I mean, I guess I didn't, I've never had a blackout before, so I guess I, I didn't know. Maybe I'm not using the right words. But I just thought that I had, just tired and fell asleep. And I don't remember anymore, at all over the whole evening. And it's several hours that I don't recall at all. So I just assumed that I was asleep. I work a lot. I was busy and tired. So that's just what I

30

assumed it to be. But, I, I mean, it was in the daytime, it wasn't in the middle of the night that I was sleeping. I mean . . . ."

ff.     "And since I was with my, back with my boyfriend, I never gave that a second thought when I found out I was pregnant later. And, uh, so that's why I didn't do anything about it at the time . . . ."

gg.     "But he's swearing in court that we had sex that day and that he could be the father of my child. So that's why it came up now, because I didn't know that that happened then. I have no memory of even being conscious after that, after what I just described to you. So that's why it's coming up now."

hh.     "Because March . . . February 29th, I was aware of it, and it was a consensual thing."

ii.     "Right." [In response to, "So you say you don't recall anything. You had a couple of drinks on March the 14th, we're talking about now. You said you don't recall anything after you had the first, well that you had two drinks, and then he brought you another one because he said you needed another drink. And then you don't recall anything else at all?"]

jj.     "And my Fitbit shows that I was not conscious. It, I use it to track my sleep, and so it didn't occur to me until after this hearing on

31

Wednesday. Because I checked my sleep pattern after I sleep, to look back and see if there was anything there from then. And he came over in the late afternoon, and there was a period of like three hours where my Fitbit shows that I was not. . . . I don't know exactly how it works. But it shows us that I wasn't conscious."

kk.    "Right? How else would I know what happened?" [In response to, "You only have this date of March 14th as a date that you had unconsensual [sic] sex with him, because this is the date that he provided to the court. If he had said February 29th, then you would have been able to... You said, "Okay. Yeah. I did have consensual sex with him on that date." But you only have March 14th because this is what he said."]

ll.    "No." [In response to, "It was nothing to indicate that you all had had sex?"]

mm.    "And he got me drunk, basically."

nn.    "The crime is, is, is having sex with them when they are unable to consent because they're intoxicated."

oo.    "Yes." [In response to, "has he ever acted in a manner that would indicate that he would forcibly take sex from you?"]

32

pp.     "I was not agreeing to have sex with him on that date, March 14, 2020]. . . . Or for two weeks before that."

qq.     "If, if somebody is passed out, can they consent to sex though?"

rr.     "That's the way alcohol works. I don't have a clear memory of it, because I was intoxicated. And all I know is that my Fitbit, of the, the precise times that I basically fell asleep or lost consciousness or whatever."

ss.     "I didn't agree to sex, and he's saying we had sex. I said no to him kissing me."

tt.     "But when I'm too intoxicated to be aware or remember it, that's not okay for him to do that. That's a crime. It is a crime to have sex with somebody who cannot consent."

uu.     "I didn't consent. I said no, uh to kissing, much less anything else. And then if I'm too intoxicated to, to be aware of anything, how can I possibly give consent? That's not consent."

vv.     "Possibly I mean, I have no memory of it." [In response to, "So if the paternity test come back, that is not his child, will there be in your head, 'Okay. Maybe he's just saying that we had sex.'."]

ww.    "Right." [In response to, "And so if, if it comes back that it's not his child, then you will possibly believe that he's just talking. But as of

33

right now, you don't want to believe that because there's a possibility that it could be his child?"]

xx.   "He has problems. And, I, he's probably trying to break up my marriage and whatever else. So he's obviously causing a lot of problems and trying to get interspersed here, but I just... The guy's testifying under oath that . . . describing everything with me in the same day, that he brought the pie on Pi Day, and that we hung out and then had sex. When I'm saying that's not what happened. He tried to make advance to me, and I said, 'No.' And he left to get another drink. And we, there wasn't anything else that, uh, I agreed to happening. And he's the one saying that this all happened on that day."

77.   Defendant Gibbs, made the May 10 SVU Accusations in order, *inter alia*, to wrongfully and fraudulently prevent Mr. Jurczak from realizing his right to have his Daughter legitimated so that he can have a relationship with her. Defendant Gibbs stated to SVU: "I don't even want them to do the testing. But if they do, and then he's gonna, try to, you know, to get my child or something. So, that's why I'm here."

78.   On May 20, 2021, Defendant Gibbs filed a counterclaim for "Violent Injury" in the Paternity Action, in which she alleged that for the dates of March 10,

11, 14, and 15, 2020, if she had sexual intercourse with Mr. Jurczak, it "was a violent sexual assault" that occurred without her consent or knowledge. This was the first time Mr. Jurczak learned that Defendant Gibbs was accusing him of rape.

79.     After Mr. Jurczak sent a second abusive litigation letter to Defendant Gibbs, she voluntarily dismissed her counterclaims.

80.     Defendant Gibbs has since admitted that Mr. Jurczak did not rape her on March 10, 11, or 15.

81.     From July of 2021 through the Fall of 2021, in multiple oral conversations with Dr. Jonathan Hundley, Defendants Gibbs communicated the false and *per se* slanderous accusations: (1) that in Mr. Jurczak's professional capacity as a contractor of Organ Preservation Consultants, he posed a risk to her physical safety in their mutual worksite of Piedmont Hospital; (2) that Mr. Jurczak's conduct towards her warranted him being terminated from his employment; and (3) that Mr. Jurczak had physically and/or sexually assaulted her (the "Hundley Accusations") (the May 9 APD Accusations, May 10 SVU Accusations, and Hundley Accusations, collectively, the "Slanderous Accusations").

82.     Defendant Gibbs communicated the false and slanderous *per se* Hundley Accusations over a series of communications to Dr. Hundley from July of

2021 through the Fall of 2021, including the following statements, some of which are independently slanderous *per se*:

    a.    She referred to Mr. Jurczak as the "perpetrator," and stated to Dr. Hundley that she did so because when she says Mr. Jurczak's name it makes her shake and she gets really emotional;

    b.    She stated she was scared of Mr. Jurczak;

    c.    She stated she was glad he would no longer be working at Piedmont Hospital so she would not have to see him;

    d.    She stated she feared Mr. Jurczak;

    e.    She stated she was physically afraid of Mr. Jurczak;

    f.    She stated she felt unsafe around Mr. Jurczak;

    g.    She asked about Mr. Jurczak's employer;

    h.    She stated she was in a paternity lawsuit with Mr. Jurczak;

    i.    She refused to say what Mr. Jurczak had done to her;

    j.    She stated that when she ultimately tells Dr. Hundley what happened with Mr. Jurczak, he will not believe the whole mess; and

    k.    She communicated that when Dr. Hundley learns the whole story, he will want to punch someone.

83.     In making the statements listed in the above paragraph, Defendant Gibbs intended to and did falsely communicate to a third party that Mr. Jurczak posed a risk to her physical safety in their mutual workplace of Piedmont Hospital, that Mr. Jurczak's conduct towards her warranted him being terminated from his employment, and that Mr. Jurczak had been physically and/or sexually violent towards her.

84.     Dr. Hundley, in fact, understood Defendant Gibbs' statements from July of 2021 through the Fall of 2021 to mean that Mr. Jurczak posed a risk to her physical safety in their mutual workplace of Piedmont Hospital, and that Mr. Jurczak's conduct towards her warranted him being terminated from his employment.

85.     Dr. Hundley, in fact, understood Defendant Gibbs' statements from July of 2021 through the Fall of 2021 to mean that Mr. Jurczak had been physically and/or sexually violent towards her, and upon learning of the Paternity Action, understood Defendant Gibbs to have been communicating that Mr. Jurczak raped her.

86.     In communicating the Hundley Accusations, Defendant Gibbs intended that Dr. Hundley would pass along information to Organ Preservation Consultants and thereby interfere with Mr. Jurczak's employment with Organ

Preservation Consultants, including by limiting Mr. Jurczak's ability to work onsite at Piedmont Hospital.

87.    When communicating the Hundley Accusations, Defendant Gibbs was aware that Dr. Hundley would likely communicate the Hundley Accusations to Organ Preservation Consultants.

88.    Dr. Hundley, in fact, communicated the Hundley Accusations to Organ Preservation Consultants, which resulted in Mr. Jurczak losing his ability to work at the Piedmont Hospital site and the loss of significant income to which he otherwise would have been entitled.

89.    Defendant Gibbs was aware that Dr. Hundley subsequently spoke to Organ Preservation Consultants and conveyed that Defendant Gibbs felt unsafe around Mr. Jurczak, which resulted in Mr. Jurczak losing his ability to work at the Piedmont Hospital site and the loss of significant income that he would have gained. And Defendant Gibbs did not attempt to rectify this but instead expressed that she was glad she would not have to see him.

90.    Upon information and belief, Defendant Gibbs communicated the Hundley Accusations in order to injure Mr. Jurczak's professional reputation and to deprive him of the financial means to pursue the legitimation of his Daughter.

91.     While Dr. Hundley and Defendant Gibbs were both employed by Piedmont Healthcare, Dr. Hundley's employment duties and authority did not include a supervisory or human resources function as to Defendant Gibbs. Accordingly, Defendant Gibbs did not have a reason to communicate the Hundley Accusations based on his duty or authority.

92.     It is false that Mr. Jurczak posed any risk to Defendant Gibbs' physical safety, including in his professional capacity as a contractor of Organ Preservation Consultants in their mutual worksite of Piedmont Hospital, which she knew when she published the Slanderous Accusations.

93.     It is false that Mr. Jurczak's conduct towards Defendant Gibbs warranted him being terminated from his employment, which she knew when she published the Slanderous Accusations.

94.     It is false that Mr. Jurczak raped Defendant Gibbs—including by having nonconsensual sexual intercourse with her—which she knew when she published the Slanderous Accusations.

95.     It is false that Defendant Gibbs did not have consensual sexual intercourse with Mr. Jurczak in a timeframe in March of 2020 that could result in the conception of a child, which she knew when she published the Slanderous Accusations.

96.     It is false that Defendant Gibbs does not recall having consensual sexual intercourse with Mr. Jurczak on March 14, 2020, which she knew when she published the Slanderous Accusations.

97.     It is false that Mr. Jurczak and Defendant Gibbs had sexual intercourse while she was unconscious, blacked out, or passed out, which she knew when she published the Slanderous Accusations.

98.     It is false that Mr. Jurczak and Defendant Gibbs had sexual intercourse while she was unable to give consent, which she knew when she published the Slanderous Accusations.

99.     It is false that Defendant Gibbs lost consciousness, blacked out, or passed out—as opposed to fell asleep—on March 14 or 15, 2020, which she knew when she published the Slanderous Accusations.

100.   It is false that Defendant Gibbs' Fitbit shows that she was ever asleep while having sexual intercourse with Mr. Jurczak, which she knew when she published the Slanderous Accusations.

101.   It is false that Defendant Gibbs' Fitbit shows that she was asleep (or unconscious, blacked out, or passed out) on March 14, 2020, for a 3-hour period starting at 6:38 pm, which she knew when she published the Slanderous

Accusations, including because the data showed she was awake by 8:46 pm, and remained awake until 11:59 pm.

102.   It is false that it did not occur to Defendant Gibbs until after the May 5, 2021, hearing in the Paternity Action that her Fitbit data might contain evidence of the events of March 14, 2020, which she knew when she published the Slanderous Accusations. Indeed, just 5 days before she lied to the SVU about this, she had testified at the May 5, 2021, hearing that she had already checked her Fitbit to see when she was sleeping on March 14, 2020.

103.   It is false that on March 14, 2020, Defendant Gibbs rebuffed Mr. Jurczak's sexual advances and/or that Mr. Jurczak then told her she needed another drink, which she knew when she published the Slanderous Accusations.

104.   It false that as of May 9, 2021, Defendant Gibbs believed that her current husband could have been the father of Mr. Jurczak's Daughter, which she knew when she published the Slanderous Accusations.

105.   It is false that as of May 9, 2021, Defendant did not know that that Mr. Jurczak was their Daughter's father, which she knew when she published the Slanderous Accusations.

106.   It is false that Mr. Jurczak ever drugged Defendant Gibbs, which she knew when she published the Slanderous Accusations.

107.   It is false that Mr. Jurczak ever made Defendant Gibbs become intoxicated to the point of losing consciousness, which she knew when she published the Slanderous Accusations.

108.   It is false that Mr. Jurczak *got* Defendant Gibbs drunk on March 14, 2020.

109.   It is false that Mr. Jurczak and Defendant Gibbs did not repeatedly have consensual, unprotected sexual intercourse on February 29, 2020, and on March 1, 6, 10, 11, 14, and 15, 2020, which she knew when she published the Slanderous Accusations.

110.   It is false that Mr. Jurczak and Defendant Gibbs were just friends after they had sexual intercourse on February 29, 2020—including as evidenced by her exchanging sexually charged text messages with Mr. Jurczak in March of 2020—which she knew when she published the Slanderous Accusations.

111.   It is false that Mr. Jurczak committed perjury by testifying that he and Defendant Gibbs repeatedly had consensual, unprotected sexual intercourse over the course of February 29, 2020, and March 1, 6, 10, 11, 14, and 15, 2020, which she knew when she published the Slanderous Accusations.

112.   It is false that Mr. Jurczak has ever acted in a manner that would indicate he would rape Defendant Gibbs, forcibly or otherwise, which she knew when she published the Slanderous Accusations.

113.   It is false that Mr. Jurczak is pursuing the Paternity Action because he is trying to break-up Defendant Gibbs' current marriage, which she knew when she published the Slanderous Accusations.

114.   When Defendant Gibbs made the Slanderous Accusations, she knowingly omitted the following information, which contributed to the false and *per se* defamatory Slanderous Accusations:

a.   That during the three-hour period of time from 6:38 pm on March 14, 2020, that she claimed to have been unconscious, she exchanged 16 text messages with her now-husband/then-ex-boyfriend, including her 8:43 pm text messages stating she "Fell asleep" and asking him "How can you car shop so late?";

b.   That the reason she took an approximately two-hour nap after having sexual intercourse with Mr. Jurczak on March 14, 2020, was that she had woken up at 2:58 am that morning and was transplanting a liver into a patient by 4:00 am, and, that human beings release hormones in response to sexual intercourse that leads to post-coital sleepiness;

c.     That when work disturbed her normal sleep schedule, she would take naps;

d.     That on March 14 and 15, 2020, she was on call for her work as a transplant surgeon and that she took a call from work sometime between 2:00 am and 3:00 am on March 15, 2020, regarding an organ;

e.     That because Defendant Gibbs was on call on March 14 and 15, 2020, she was not permitted under the rules of Piedmont Hospital, where she worked, and the Georgia Composite Medical Board, to drink to the point of intoxication while on call;

f.     That she in fact knew that Mr. Jurczak had not drugged her; and

g.     That she already knew Mr. Jurczak was their Daughter's father by late January 2021 because Defendant Gibbs' paternity test for her current husband was negative, and she knew that Mr. Jurczak was the only other person with whom she had sexual intercourse during the period in March 2020 when their Daughter was conceived.

115.   The truth of the matter is that Mr. Jurczak and Defendant Gibbs had consensual, unprotected sexual intercourse on February 29, 2020, and March 1, 6, 10, 11, 14, and 15, 2020.

116.   The truth of the matter is that Mr. Jurczak has never rendered Defendant Gibbs unconscious, blacked out, or passed out by drugging her or getting her intoxicated.

117.   The truth of the matter is that Defendant Gibbs simply "fell asleep" on March 14, 2020, after she had consensual sexual intercourse with Mr. Jurczak, because she had woken up at 2:58 am to start working in the early morning, and she took a post-coital nap. Indeed, in her text message to her now-husband/then-ex-boyfriend **at 8:43 pm, March 14, 2020, she stated she "Fell asleep."** Through the ensuing 20-text-message exchange, she makes no mention of having been rendered unconscious or feeling the effects of having been rendered unconscious.

118.   The truth of the matter is that Mr. Jurczak has never had sexual intercourse with Defendant Gibbs while she was unconscious, blacked out, or passed out.

119.   The truth of the matter is that Mr. Jurczak did not commit perjury when he testified in the hearing in the Paternity Action in May 2021 and also submitted an affidavit.

120.   The truth of the matter is that Mr. Jurczak has never posed a threat of physical safety to Defendant Gibbs, including in the workplace.

121.   The truth of the matter is that Mr. Jurczak's conduct did not warrant his termination from his employment.

122.   The truth of the matter is that there is no evidence that Mr. Jurczak committed the conduct referenced in the Slanderous Accusations; to the contrary, the evidence shows he is innocent.

123.   The truth of the matter is that Defendant Gibbs knowingly fabricated the Slanderous Accusations from whole cloth.

124.   Defendant Gibbs foreseeably caused Mr. Jurczak to suffer actual damages by making the Slanderous Accusations, including severe emotional distress and loss of his reputation.

125.   Defendant Gibbs foreseeably caused Mr. Jurczak to suffer lost wages by making the Hundley Accusations.

126.   In making the Slanderous Accusations, Defendant Gibbs knowingly intended to injure Mr. Jurczak, and her actions showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

127.   On August 13, 2021, Mr. Jurczak first learned that Defendant Gibbs had made the May 9 APD Accusations and the May 10 SVU Accusations, which he discovered from Defendant Gibbs' response to an interrogatory.

128.   The fact that Defendant Gibbs made the false May 9 APD Accusations and the false May 10 SVU Accusations—putting his life and liberty at jeopardy—terrified Mr. Jurczak.

129.   Mr. Jurczak requested that Defendant Gibbs retract her slanderous accusations, but she refused. (A true and correct copy of the retraction demand is attached hereto as "Exhibit A.")

## CAUSES OF ACTION

### COUNT I – SLANDER *PER SE* FOR THE MAY 9 APD ACCUSATIONS

130.   Plaintiffs incorporate by reference paragraphs 1 through 129 of this Complaint as if fully stated herein.

131.   The May 9 APD Accusations are false.

132.   The May 9 APD Accusations are *per se* slanderous.

133.   The May 9 APD Accusations are about Mr. Jurczak.

134.   Defendant Gibbs published the May 9 APD Accusations to third parties without privilege.

135.   Defendant Gibbs published the May 9 APD Accusations with actual malice—i.e., knowledge that the May 9 APD Accusations were false or with reckless disregard for their falsity—including because she consciously fabricated them from whole cloth.

136.   Defendant Gibbs knew that the May 9 APD Accusations were false because, as a firsthand source, she knew that she had fabricated them.

137.   Defendant Gibbs knew that the May 9 APD Accusations were false, including because she consciously omitted and otherwise misrepresented factual information when communicating the May 9 APD Accusations.

138.   Defendant Gibbs published the May 9 APD Accusations with actual malice, including because she has a known bias, hostility, and animus against Mr. Jurczak. Indeed, her accusations against Mr. Jurczak form part of a continuing course of conduct of communicating falsehoods about him in order to prevent him from succeeding in his petition for legitimation of his Daughter.

139.   Because the May 9 APD Accusations are slanderous *per se*, compensatory damages are presumed as a matter of law.

140.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the May 9 APD Accusations, including to his reputation.

141.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the May 9 APD Accusations, including emotional and mental distress.

142.   Mr. Jurczak is entitled to an award of compensatory damages against Defendant Gibbs in an amount to be proven at trial based on the May 9 APD Accusations.

143.   Defendant Gibbs published the May 9 APD Accusations in an attempt to cause harm to Mr. Jurczak.

144.   Defendant Gibbs published the May 9 APD Accusations with actual malice and common law malice, thereby entitling Mr. Jurczak to an award of punitive damages.

145.   Despite Mr. Jurczak's demand for retraction, Defendant Gibbs has failed and refused to retract the May 9 APD Accusations.

146.   Defendant Gibbs' actions in publishing the May 9 APD Accusations showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

147.   Mr. Jurczak is entitled to an award of punitive damages against Defendant Gibbs based on the May 9 APD Accusations.

148.   Defendant Gibbs published the May 9 APD Accusations without privilege because she published them with actual malice and not in good faith.

149.   Defendant Gibbs has acted in bad faith, has been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense by making and refusing to retract her May 9 APD Accusations, and Mr. Jurczak is entitled to recovery of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## COUNT II – SLANDER *PER SE* FOR THE MAY 10 SVU ACCUSATIONS

150.   Plaintiffs incorporate by reference paragraphs 1 through 129 of this Complaint as if fully stated herein.

151.   The May 10 SVU Accusations are false.

152.   The May 10 SVU Accusations are *per se* slanderous.

153.   The May 10 SVU Accusations are about Mr. Jurczak.

154.   Defendant Gibbs published the May 10 SVU Accusations to third parties without privilege.

155.   Defendant Gibbs published the May 10 SVU Accusations with actual malice—i.e., knowledge that the May 10 SVU Accusations were false or with reckless disregard for their falsity—including because she consciously fabricated them from whole cloth.

156.   Defendant Gibbs knew that the May 10 SVU Accusations were false because, as a firsthand source, she knew that she had fabricated them.

157.   Defendant Gibbs knew that the May 10 SVU Accusations were false, including because she consciously omitted and otherwise misrepresented factual information when communicating the May 10 SVU Accusations.

158.   Defendant Gibbs published the May 10 SVU Accusations with actual malice, including because she has a known bias, hostility, and animus against Mr.

Jurczak. Indeed, her accusations against Mr. Jurczak form part of a continuing course of conduct of communicating falsehoods about him in order to prevent him from succeeding in his petition for legitimation of his Daughter.

159.   Because the May 10 SVU Accusations are slanderous *per se*, compensatory damages are presumed as a matter of law.

160.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the May 10 SVU Accusations, including to his reputation.

161.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the May 10 SVU Accusations, including emotional and mental distress.

162.   Mr. Jurczak is entitled to an award of compensatory damages against Defendant Gibbs in an amount to be proven at trial based on the May 10 SVU Accusations.

163.   Defendant Gibbs published the May 10 SVU Accusations in an attempt to cause harm to Mr. Jurczak.

164.   Defendant Gibbs published the May 10 SVU Accusations with actual malice and common law malice, thereby entitling Mr. Jurczak to an award of punitive damages.

165.   Despite Mr. Jurczak's demand for retraction, Defendant Gibbs has failed and refused to retract the May 10 SVU Accusations.

166.   Defendant Gibbs' actions in publishing the May 10 SVU Accusations showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

167.   Mr. Jurczak is entitled to an award of punitive damages against Defendant Gibbs based on the May 10 SVU Accusations.

168.   Defendant Gibbs published the May 10 SVU Accusations without privilege because she published them with actual malice and not in good faith.

169.   Defendant Gibbs has acted in bad faith, has been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense by making and refusing to retract her May 10 SVU Accusations, and Mr. Jurczak is entitled to recovery of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## COUNT III – SLANDER AND SLANDER *PER SE* FOR THE HUNDLEY ACCUSATIONS

170.   Plaintiffs incorporate by reference paragraphs 1 through 129 of this Complaint as if fully stated herein.

171.   The Hundley Accusations are false.

172.   The Hundley Accusations are slanderous and *per se* slanderous.

173.   The Hundley Accusations are about Mr. Jurczak.

174.   Defendant Gibbs published the Hundley Accusations to a third party without privilege.

175.   Defendant Gibbs intended to convey the slanderous *per se* gists communicated by the Hundley Accusations.

176.   Defendant Gibbs intended and reasonably foresaw that Dr. Hundley would communicate the Hundley Accusations to a third party, including communicating to Organ Preservation Consultants that in Mr. Jurczak's professional capacity as a contractor of Organ Preservation Consultants, he posed a risk to Defendant Gibbs' physical safety in their mutual worksite of Piedmont Hospital.

177.   Defendant Gibbs intended and reasonably foresaw that Mr. Jurczak would lose the ability to work at Piedmont Hospital by communicating the Hundley Accusations to a third party.

178.   Defendant Gibbs published the Hundley Accusations with actual malice—i.e., knowledge that the Hundley Accusations were false or with reckless disregard for their falsity—including because she consciously fabricated them from whole cloth.

179.   Defendant Gibbs knew that the Hundley Accusations were false because, as a firsthand source, she knew that she had fabricated them.

180.   Defendant Gibbs knew that the Hundley Accusations were false, including because she consciously omitted and otherwise misrepresented factual information when communicating the Hundley Accusations.

181.   Defendant Gibbs published the Hundley Accusations with actual malice, including because she has a known bias, hostility, and animus against Mr. Jurczak. Indeed, her accusations against Mr. Jurczak form part of a continuing course of conduct of communicating falsehoods about him in order to prevent him from being legitimated as the father of his Daughter.

182.   Because the Hundley Accusations are slanderous *per se*, compensatory damages are presumed as a matter of law.

183.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the Hundley Accusations, including to his reputation.

184.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the Hundley Accusations, including emotional and mental distress.

185.   Mr. Jurczak has suffered actual damages as a direct and foreseeable result of the Hundley Accusations, including lost wages when Organ Preservation Consultants no longer permitted Mr. Jurczak to work at Piedmont Hospital, which was his only worksite.

186.   Mr. Jurczak is entitled to an award of compensatory damages against Defendant Gibbs in an amount to be proven at trial based on the Hundley Accusations.

187.   Defendant Gibbs published the Hundley Accusations in an attempt to cause harm to Mr. Jurczak.

188.   Defendant Gibbs published the Hundley Accusations with actual malice and common law malice, thereby entitling Mr. Jurczak to an award of punitive damages.

189.   Despite Mr. Jurczak's demand for retraction, Defendant Gibbs has failed and refused to retract the Hundley Accusations.

190.   Defendant Gibbs' actions in publishing the Hundley Accusations showed willful misconduct, malice, fraud, wantonness, oppression, and that entire want of care which would raise the presumption of conscious indifference to consequences.

191.   Mr. Jurczak is entitled to an award of punitive damages against Defendant Gibbs based on the Hundley Accusations.

192.   Defendant Gibbs published the Hundley Accusations without privilege because she published them with actual malice and not in good faith.

193.   Defendant Gibbs has acted in bad faith, has been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense by making and refusing to retract her Hundley Accusations, and Mr. Jurczak is entitled to recovery of attorneys' fees pursuant to O.C.G.A. § 13-6-11.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Jurczak respectfully requests that the Court grant him the following relief against Defendant Gibbs:

A.   Compensatory damages in an amount to be proven at trial in excess of $75,000;

B.   An award of attorneys' fees and costs, including pursuant to O.C.G.A. § 13-6-11, in an amount to be proven at trial;

C.   An award of punitive damages in an amount to be proven at trial; and

D.   Such other relief as the Court deems just and proper.

This 7th day of May, 2022.

By:  */s/ Jonathan D. Grunberg*
   Nicole Jennings Wade
   State Bar No. 390922
   nwade@wgwlawfirm.com
   Jonathan D. Grunberg
   State Bar No. 869318
   jgrunberg@wgwlawfirm.com
   G. Taylor Wilson
   State Bar No. 460781
   twilson@wgwlawfirm.com

WADE, GRUNBERG & WILSON, LLC
600 Peachtree Street N.E.
Suite 3900
Atlanta, GA 30308
Telephone:   (404) 600-1153
Facsimile:   (404) 969-4333

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts so triable.

This 7th day of May, 2022.

By:  */s/ Jonathan D. Grunberg*
Nicole Jennings Wade
State Bar No. 390922
nwade@wgwlawfirm.com
Jonathan D. Grunberg
State Bar No. 869318
jgrunberg@wgwlawfirm.com
G. Taylor Wilson
State Bar No. 460781
twilson@wgwlawfirm.com

WADE, GRUNBERG & WILSON, LLC
600 Peachtree Street N.E.
Suite 3900
Atlanta, GA 30308
Telephone:   (404) 600-1153
Facsimile:    (404) 969-4333

*Attorneys for Plaintiff*

## <u>CERTIFICATION UNDER L.R. 7.1D.</u>

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that this COMPLAINT is a computer document and was prepared in Times New Roman 14-point font, as mandated in Local Rule 5.1C.

This 7th day of May, 2022.

By: */s/ Jonathan D. Grunberg*
    Nicole Jennings Wade
    State Bar No. 390922
    nwade@wgwlawfirm.com
    Jonathan D. Grunberg
    State Bar No. 869318
    jgrunberg@wgwlawfirm.com
    G. Taylor Wilson
    State Bar No. 460781
    twilson@wgwlawfirm.com

    WADE, GRUNBERG & WILSON, LLC
    600 Peachtree Street N.E.
    Suite 3900
    Atlanta, GA 30308
    Telephone:   (404) 600-1153
    Facsimile:    (404) 969-4333

    *Attorneys for Plaintiff*